IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

DEVAWN GLENN,                    )       CASE NO.  1:19-cv-000965
                                 )
            Plaintiff,           )       MAGISTRATE JUDGE
                                 )       KATHLEEN B. BURKE
      v.                         )
                                 )
COMMISSIONER OF SOCIAL           )
SECURITY,                        )
                                 )       **MEMORANDUM OPINION & ORDER**
            Defendant.           )

Plaintiff Devawn Glenn ("Plaintiff" or "Glenn") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her applications for social security disability benefits.  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 14.

For the reasons explained herein, the Court **AFFIRMS** the Commissioner's decision.

## I.  Procedural History

On March 23, 2016, Glenn protectively filed applications for disability insurance benefits

("DIB") and supplemental security income ("SSI").[1]  Tr. 12, 91, 199-204, 205-213.  Glenn

alleged a disability onset date of July 27, 2010.  Tr. 12, 200, 205.   She alleged disability due to

back problems.  Tr. 56, 133, 149.

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 4/16/2020).

After initial denial by the state agency (Tr. 133-146) and denial upon reconsideration (Tr. 149-160), Glenn requested a hearing (Tr. 161-162).  A hearing was held before an Administrative Law Judge ("ALJ") on March 7, 2018.  Tr. 25-54.  On July 5, 2018, the ALJ issued an unfavorable decision (Tr. 9-24), finding that Glenn had not been under a disability within the meaning of the Social Security Act from July 27, 2010, through the date of the decision (Tr. 12, 20).  Glenn requested review of the ALJ's decision by the Appeals Council.  Tr. 195-198.  On February 26, 2019, the Appeals Council denied Glenn's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-8.

## II. Evidence

### A.    Personal, vocational and educational evidence

Glenn was born in 1983.  Tr. 19, 200.  She has a high school education.  Tr. 19, 29, 233. She received a certificate for attending an administrative assistant office specialist program.  Tr. 29.  She also took a course to receive her STNA license.  Tr. 30.  Glenn last worked as a nursing assistant in 2010.  Tr. 30.  Prior to her nursing assistant position, Glenn worked as a cashier from 2003 through 2006.  Tr. 31.

### B.    Medical evidence

#### 1.    Treatment history

In July 2010, Glenn suffered a workplace injury to her back.  Tr. 663-665.  She had various evaluations for purposes of her workers compensation claim.  *See e.g.*, 657-659, 660-662, 663-665.  During a workers compensation reexamination evaluation conducted on March 14, 2011, Glenn was in a moderate amount of pain and discomfort in the thoracic, lower lumbar area of both legs; reflexes in the upper and lower extremities were graded at 2/4 for patella and

2/4 for Achilles and were symmetrical; [2] sensory evaluation was within normal limits; Lasegues

Test[3] was positive for an increase in low back pain and leg pain bilaterally; range of motion of

the lumbar spine was significantly decreased and asymmetrical; and there were muscle spasms

through the core lumbar paraspinals from the L1 to S1 area with notable palpable tenderness

over the L1 through S1 segments.  Tr. 664.  The evaluator, Steven John Papandreas, B.S., D.C.,

felt that Glenn was experiencing a flare up of her chronic spinal injuries and recommended

various therapies and rehabilitation.  Tr. 664.

On January 17, 2012, Glenn had an MRI of her lumbar spine. Tr. 578-579.  The clinical

history indicated Glenn was a "28-year-old female with history of work related injury resulting

in low to upper back pain and burning pain in the buttocks and hips going down the legs."  Tr.

578.  The MRI showed a herniation at L1-2 compressing on the thecal sac and nerve roots

resulting in moderate to severe central stenosis.  Tr. 578, 579.  There was multilevel posterior

annular bulging at T11-12 and T12-L1 levels and posterior annular bulging at L4-5.  Tr. 579.

There was moderately severe discogenic spondylosis at T11-12 and T12-L1 with mild

spondylosis at L2-3 and early to mild spondylosis at L1-2.  Tr. 579.

---

[2] By convention the deep tendon reflexes are graded as follows:

- 0 = no response; always abnormal

- 1+ = a slight but definitely present response; may or may not be normal

- 2+ = a brisk response; normal

- 3+ = a very brisk response; may or may not be normal

- 4+ = a tap elicits a repeating reflex (clonus); always abnormal

https://www.ncbi.nlm.nih.gov/books/NBK396/ (last visited 4/16/2020).

[3] "Lasègue sign, [is] also known as Straight Leg Raise test (SLR)[.]" https://www.physio-pedia.com/Las%C3%A8gue_sign (last visited 4/16/2020).

On February 20, 2012, Glenn had back surgery due to her disc herniation.  Tr. 281-287.
The hemilaminectomy of the L1 and L2 with central lateral and bilateral decompressions with
lumbar diskectomy at L1-2 was performed at Southwest General Health Center.  Tr. 284, 414,
493.

On October 14, 2014, Glenn presented for a spine consult at MetroHealth Medical
Center.  Tr. 413-415.  She was seen and evaluated by Dr. Timothy A. Moore, M.D.  Tr. 415, 388.
Glenn complained of back pain that she described as constant, stabbing, sharp and aching.  Tr.
414.  Glenn relayed that her pain radiated to her legs bilaterally; she had numbness and tingling
in her feet; she reported loss of balance, falling and urinary incontinence.  Tr. 414.  Glenn had
tried injections in the past as well as Percocet, Neurontin, and Tylenol with codeine.  Tr. 414.
Dr. Moore indicated the following physical examination findings – 4+/5 motor strength in the
lower extremities; sensation was decreased in the L5/S1; gait difficulties with tandem; and
straight leg raise was positive bilaterally.  Tr. 415.  Glenn had a recent lumbar MRI and Dr.
Moore reviewed the results, indicating that the MRI showed multiple levels of "ddd"; disc
herniation at L1/L2 causing mild to moderate canal stenosis; and kyphosis above L1.[4]  Tr. 415.
Dr. Moore recommended further surgery – lumbar fusion – to stop the progression of Glenn's
symptoms, noting that the additional surgery was not guaranteed to take away Glenn's pain.  Tr.
415.

On October 31, 2014, Dr. Moore performed a lateral L1/L2 interbody fusion, posterior
percutaneous screws L1/L2.  Tr. 331, 388-391.  Following surgery, Glenn saw pain management
and received physical therapy.  *See e.g.*, Tr.  321-324.  Glenn reported some improvement

---

[4] "Kyphosis is an exaggerated, forward rounding of the back."  https://www.mayoclinic.org/diseases-
conditions/kyphosis/symptoms-causes/syc-20374205 (last visited 4/16/2020).

following her surgery but she fell in November 2014 and her low back and hip pain had returned even prior to her fall.  Tr. 323.

As of January 2, 2015, Dr. Melvin S. Mejia, M.D., with the Physical Medicine & Rehab ("PMR") department, indicated that Glenn was struggling with her back pain but she was trying to wean off of Oxycontin – she was relying on Oxycodone with Tylenol.  Tr. 321.  She was not having bowel or bladder issues, she was independent for activities of daily living, and she was using a cane.  Tr. 321, 322.  Glenn had a cautious gait and her motor strength was 4-5/5 throughout.  Tr. 322.  During a follow up visit with Dr. Mejia on January 28, 2015, Dr. Mejia observed 4-5/5 motor strength throughout; intact sensation to light touch; allodynia at the left flank;[5] a cautious gait; and Glenn ambulated with a cane but noted that Glenn had also ambulated without a cane.  Tr. 317.  Dr. Mejia recommended that Glenn continue with outpatient physical therapy closer to home; follow up with Ortho Spine as scheduled; and follow palliative care for optimization of medication management.  Tr. 317.

During a March 10, 2015, visit with Dr. Moore, Glenn was doing pretty well – her bowel and bladder symptoms had improved significantly.  Tr. 314.  She was having "a lot of misery from both incisions[]" but no evidence of infection.  Tr. 314.  Glenn was neurologically intact in her bilateral lower extremities.  Tr. 314.  Dr. Moore felt that Glenn was doing very well at five months post-op.  Tr. 314.  His plan included "[a]ctivities as tolerated" and he would see Glenn back in August.  Tr. 314.  Later, on March 31, 2015, Glenn saw Dr. Michael D. Harrington, M.D., in internal medicine for a palliative care follow up.  Tr. 312.  Lidoderm patches were helping some.  Tr. 312.  Glenn was performing physical therapy – she was sore after performing

---

[5] "Allodynia is an unusual symptom that can result from several nerve-related conditions. When you're experiencing it, you feel pain from stimuli that don't normally cause pain."  https://www.healthline.com/health/allodynia (last visited 4/16/2020).

core work.  Tr. 312.  The Oxycodone helped Glenn when she was doing her therapy.  Tr. 312.

Psychiatry had increased Glenn's Wellbutrin and Glenn was taking it at night because it was

sedating.  Tr. 312.  Glenn was not using a cane; her strength was improving, and her function

was improving.  Tr. 312.

A September 1, 2015, Dr. Moore office visit note indicated that an MRI and CAT scan

had been performed and there was no extrinsic compression of the conus – there was a residual

disk there but it was way below the level of the disk space but there was no compression.  Tr.

304.  Dr. Moore recommended that Glenn stay active and aggressive and get through the winter

and he wanted to see her back in January/February with imaging of the spine centered at L1.  Tr.

304.

Glenn saw Dr. Moore on January 14, 2016, for follow up.  Tr. 299-300.  She reported

having a lot of upper extremity symptoms with numbness and tingling in her hands.  Tr. 300.

Glenn was unable to work at a computer and wanted disability.  Tr. 300.  Dr. Moore relayed that

Glenn's cervical spine had never been imaged but he would order imagining for that area for

Glenn if she wanted.  Tr. 300.  Dr. Moore reviewed the recent CT scan and MRI, which showed

that the thoracolumbar fusion had healed.  Tr. 300.  He indicated that Glenn should follow up

with PM & R to help her with her upper extremity symptoms and ongoing maintenance of her

low back.  Tr. 300.

Glenn saw Dr. Mejia on February 9, 2016, for a PM & R visit.  Tr. 297-299.  Glenn

reported having finished her outpatient physical therapy since her last visit in May 2015 and she

relayed her back pain was no better and was actually worse.  Tr. 298.  Glenn was ambulating

with no devices and had no bowel or bladder issues.  Tr. 298.  She was independent with her

self-care and able to drive.  Tr. 298.  She was treating with palliative care and taking her

medications as prescribed.  Tr. 298.  She was also seeing orthopedics and was scheduled for an

MRI.  Tr. 298.  Glenn relayed that she wanted to apply for disability.  Tr. 298.  On physical

examination, Dr. Mejia observed trace edema in the extremities; 4-5/5 motor strength throughout

with "some give way weakness"; sensation intact to light touch; Glenn ambulated without a

device; and gait was within normal limits.  Tr. 298.  Dr. Mejia recommended a physical therapy

referral for conditioning exercises, core strengthening, and stretching exercises; smoking

cessation; weight loss; following with palliative care for optimization of medication

management; and encouraged Glenn to work on maintaining/increase her level of activity at

home and overcoming fear of pain.  Tr. 299.  Dr. Mejia recommended that Glenn follow up in

one month.  Tr. 299.

On March 28, 2016, Glenn had a new patient visit with Dr. Lingling Rong, M.D., in the

neurology department regarding numbness in her arms.  Tr. 290-294.  Dr. Rong's

assessment/plan was paresthesia in both arms, suspecting cervical pathology but noting that a

cervical MRI did not show foraminal stenosis and there were no signs of myelopathy on

examination.  Tr. 294.  An EMG/NCV was recommended.  Tr. 294.  Dr. Rong also assessed

back pain with radiculopathy.  Tr. 294.

Visit notes from a follow-up visit with Dr. Moore in June 2016, reflect that Glenn was

continuing to have a lot of back pain.  Tr. 779.  Dr. Moore noted that a CT scan and MRI showed

no clonus or compression and that her fusion had healed.  Tr. 779.  However, Dr. Moore noted

that Glenn had a horrible spine above and below that area and she was seeing PM & R and doing

aquatic therapy but had not had any injections.  Tr. 779.  Dr. Moore informed Glenn that he was

not sure that his surgery helped her but he felt that they did get pressure off her neurologic

elements.  Tr. 779.  Dr. Moore did not think that further surgery was prudent because he was not sure Glenn had improved from his first surgery.  Tr. 779.

During a visit with Dr. Harrington on September 6, 2017, with respect to Glenn's left L2 radiculopathy with some residual nerve injury, Dr. Harrington noted that Glenn was having a nice recovery and response to rehabilitation and therapies – there was "some equilibration of her reflexes which is exciting and stable enough but no sig improvement anymore and suspect neurologically at plateau."  Tr. 782.  However, Dr. Harrington also noted that Glenn was not getting much progress with therapy and the goal with her medications was to try to maintain some function.  Tr. 782.  He encouraged Glenn to start core exercises and to explore aquatherapy.  Tr. 782.  Dr. Harrington also advised Glenn that she needed to lose weight because it was "killing her ability to recover."  Tr. 783.  He noted that Glenn had been advised to quit smoking and she had done so in February 2017.  Tr. 783.

On January 16, 2018, Glenn attended a follow-up visit with Dr. Moore regarding her low back pain.  Tr. 757-758.  Dr. Moore noted that Glenn previously had a myelogram which showed moderate canal stenosis but Dr. Moore did not agree with that reading.  Tr. 757.  He stated that "[f]rom the myelogram, she is very well decompressed L1-2 she is floridly more than age-appropriate spondylitic spine with multiple issues, multiple reasons for pain but the anterior-posterior lumbar surgery done in October 2014 adequately decompressed her camas."  Tr. 757.  Dr. Moore noted that Glenn was still having bowel and bladder incontinence and from the myelogram he was unable to explain her symptoms.  Tr. 757.  Dr. Moore recommended that Glenn be considered for a spinal cord stimulator.  Tr. 758.  He did not feel that there was anything surgical that he could "do to improve her misery."  Tr. 758.

Glenn attended a pain management visit on February 16, 2018, with Dr. Kutaiba Tabbaa, M.D., regarding her low back pain and pain from her hips to her shoulders.  Tr. 750-755.  Glenn described the pain as constant, pinching, sharp, burning, cramping and she indicated she obtained pain relief for one hour after taking opioids.  Tr. 750.  On examination, Glenn had normal range of motion in her neck; she exhibited musculoskeletal tenderness; she had normal reflexes; and her gait was normal.  Tr. 753.  Dr. Tabbaa recommended pool therapy, weight control, and physical therapy.  Tr. 754.  Dr. Tabba noted that Glenn was severely depressed and applying for disability.  Tr. 754.

In addition to her physical impairments, Glenn has suffered from and been treated for depression and anxiety and headaches.  *See e.g.*, Tr. 18, 312, 493.

### 2.  Opinion evidence

#### a.  Consultative examining psychologist

On July 25, 2016, consultative examiner Dr. Julie Janco-Gidley, Ph.D., conducted a psychological evaluation.  Tr. 477-486.  Dr. Janco-Gidley's diagnostic impression was major depressive disorder, recurrent, moderate and unspecified anxiety disorder.  Tr. 485.

With respect to Glenn's ability to understand, remember and carry out instructions, Dr. Janco-Gidley opined that it "seems likely she would be able to understand and follow simple directions presented one at a time but seems likely she would struggle with more complex or multistep instructions.  In addition, she likely would benefit from written instructions that she refer back to frequently to address reported memory struggles."  Tr. 484.  With respect to Glenn's ability to maintain attention and concentration and persistence, Dr. Janco-Gidley opined that Glenn "may take longer than peers to complete tasks and she again would likely benefit from written instructions or checklists that she could refer back to[]" and Glenn's "reported pain

and mood issues may interfere with task completion." Tr. 484.  With respect to Glenn's ability to respond to supervision and others in a work setting, Dr. Janco-Gidley indicated that Glenn reported some minor difficulties responding to others in a work setting. Tr. 484.  With respect to Glenn's ability to respond to pressure in a work setting, Dr. Janco-Gidley indicated that Glenn reported doing fine with responding to work pressure when she had worked in the past but Dr. Janco-Gidley opined that "[c]urrently due to [Glenn's] reported mood issues and physical pain she experiences she seems as though she would struggle in this area."  Tr. 485.

### b.  Reviewing physicians/psychologists

#### *Physical*

On June 15, 2016, state agency reviewing physician Esberdado Villanueva, M.D., completed a physical RFC assessment.  Tr. 64-67.  Dr. Villanueva opined that Glenn had the RFC to occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday and push and/or pull unlimitedly, other than as indicated for lift/carry.  Tr. 86.  Dr. Villanueva opined that Glenn would have the following postural limitations – never climbing ladders/ropes/scaffolds; occasional climbing ramps/stairs, stooping, kneeling, crouching and crawling; and frequent balancing.  Tr. 65.  Dr. Villanueva opined that Glenn would be limited to frequent handling/fingering bilaterally.  Tr. 66.  Dr. Villanueva opined that Glenn should avoid all exposure to hazards such as commercial driving, unprotected heights, and dangerous machinery. Tr. 66-67.

Upon reconsideration, on November 16, 2016, state agency reviewing physician Teresita Cruz, M.D., completed a physical RFC assessment.  Tr. 101-104.  Dr. Cruz reached the same conclusions as Dr. Villanueva.  Tr. 101-104.

*Mental*

On August 24, 2016, state agency reviewing psychologist Stanley Kravitz, Ph.D., completed a psychiatric review technique ("PRT") (Tr. 62-63) and mental RFC assessment (Tr. 67-69).  In the PRT, Dr. Kravitz found that Glenn had mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation, each of an extended duration.  Tr. 62.  In the mental RFC assessment, Dr. Kravitz found that Glenn had understanding and memory limitations, explaining that Glenn could understand and remember short and multi-step tasks; perform simple, routine 1-3 step tasks but, she required support and explanation to understand and remember detailed instructions.  Tr. 67.  Dr. Kravitz found that Glenn had sustained concentration and persistence limitations, explaining that Glenn could perform short and occasional multi-step tasks in a setting with flexible pace and production requirements; could perform simple, routine 1-3 step tasks but required support and explanation to carry out detailed instructions and occasional flexibility with task, break and shift changes and occasional supervision to maintain quality and productivity.  Tr. 68.  Dr. Kravitz found that Glenn had social interaction limitations but explained that the limitations in this area were no more than mild.  Tr. 68-69.  Dr. Kravitz found that Glenn had adaptation limitations, explaining that Glenn could perform simple, 1-3 step tasks but she required "support and explanation for major changes and to travel in unfamiliar places, gradually implemented."  Tr. 69.

Upon reconsideration, on November 17, 2016, state agency reviewing psychologist Tonnie Hoyle, Psy.D., completed a PRT (Tr. 99-100) and mental RFC assessment (Tr. 104-106). Dr. Hoyle reached the same conclusions as Dr. Kravitz regarding Glenn's alleged mental impairment(s).  Tr. 104-106.

C.      **Testimonial evidence**

1.      **Glenn's testimony**

Glenn was represented and testified at the hearing.  Tr. 27, 29-45, 46-47.  Glenn lives

with her mother.  Tr. 32.  Glenn's mother performs most of the housework.  Tr. 32.  Glenn does

very little around the house.  Tr. 32-33.  If she is able to, she will sweep a little or put some

dishes away.  Tr. 32-33.  She can cook using a microwave if it only takes a couple of minutes.

Tr. 33.  She cannot stand at the stove and cook.  Tr. 33, 38.  Glenn is able to drive but she usually

does not go places alone in case she falls or anything happens.  Tr. 33.  Glenn explained that she

has fallen at times when her hip or back give out.  Tr. 33, 43-44.  She estimated falling within the

last year but she was not certain as to the date.  Tr. 33.

During the day, Glenn usually stays in bed because she is unable to do a lot of things.  Tr.

34.  Some days she stays in bed all day if she does not leave the house.  Tr. 34.  She is able to sit

in the living room sometimes but she is unable to be in one position for too long.  Tr. 34.  Even

being in bed in one position for too long is uncomfortable.  Tr. 35.  When she is lying in bed,

Glenn reads, watches television, or uses her phone to check email.  Tr. 35.  Glenn does not have

visitors; she is not involved in any activities; she does not go to church; and she does not belong

to groups.  Tr. 35.

When Glenn was asked what, from a physical stand point, was the most significant thing

keeping her from working, she indicated "pain and mobility."  Doc. 36.  She explained that her

pain was throughout her back and went down into her hips.  Tr. 36.  Her pain was always present

and walking too much or standing in one place increases her pain.  Tr. 36.  When asked how

much walking she does before her back pain worsens, she indicated about up to five minutes.  Tr.

36.  Glenn also has constant pain in her shoulders and periodic pain in her arms and hands.  Tr.

40.  She takes Oxycodone for her pain but it does not always help.  Tr. 36-37.  She was taking

Oxycodone three times each day.  Tr. 37.  She has a hard time bending over to tie her shoes.  Tr.

37.  Most of the time, Glenn is able to get dressed on her own but sometimes she needs help.  Tr.

37.  At times, her boyfriend has had to help her bathe.  Tr. 37.  She grocery shops about once or

twice every two weeks.  Tr. 37.  She has to hold on to a cart and her mother or boyfriend go with

her.  Tr. 38.  Glenn has experienced both bladder and bowel problems.  Tr. 39.

As far as recommended treatment for her back, Glenn's doctors do not think that

additional surgeries would help. Tr. 38.  Her doctors do not think that a nerve stimulator would

help.  Tr. 38-39.  Glenn indicated she was planning to go to the Cleveland Clinic pain

management program to see if they could help her, indicating it was close to her last option.  Tr.

39.  She was seeing a palliative care physician at MetroHealth.  Tr. 39.

Glenn has been diagnosed with depression.  Tr. 41.  She explained she feels useless and

worthless; she cries at different times; and she does not sleep very much.  Tr. 41.  Glenn also has

problems with anxiety.  Tr. 41.  When feeling anxious her chest hurts really bad.  Tr. 41.  Glenn

has migraines for which she receives Botox treatments every three months because other

medication has not helped.  Tr. 42.  Glenn has asthma and recently experienced a flare up.  Tr.

43.  She has both a short and long-term inhaler that she uses to treat her asthma.  Tr. 43.

## 2.    Vocational expert

A Vocational Expert ("VE") testified at the hearing.  Tr. 45-51.  The VE described

Glenn's past work as a nursing assistant as semi-skilled, medium exertion as generally performed

and very heavy as actually performed.  Tr. 47.  He explained that the cashier checker position

was semi-skilled, light as generally and as actually performed.  Tr. 47.  The ALJ asked the VE to

consider an individual of Glenn's age, education and past relevant work who has the capacity for

light work who could climb ramps and stairs occasionally; never climb ladders, ropes or scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; use bilateral upper extremities frequently for handling and fingering; would have to avoid all exposure to hazards such as industrial machinery, unprotected heights and commercial driving; has the ability to understand, remember short and multi-step instructions; perform simple, routine tasks; perform short and occasional multi-step tasks in a setting without fast pace or strict production requirements; and adapt to infrequent changes in routine.  Tr. 48.  The VE indicated that the described individual would be unable to perform Glenn's past work but there were other jobs that the individual could perform, including marker in retail, office helper, and counter clerk (photofinishing).  Tr. 48-49.  The VE explained that the identified jobs were unskilled, light jobs and he provided national job incidence numbers for each of the jobs.  Tr. 48-49.

Glenn's counsel then asked the VE questions.  Tr. 49. Referring to the state agency reviewers' opinions, Glenn's counsel asked the VE to consider the physical limitations contained in the ALJ's hypothetical along with the following mental limitations: limited to simple, routine tasks with occasional support and explanation provided; flexibility in task completion time, breaks in shifts; occasional supervision to maintain quality and productivity; would need support and explanation for changes and changes would need to be gradually implemented.  Tr. 49.  The VE indicated that those limitations would be work preclusive.  Tr. 49.

Referring to the consultative examiner's opinion, Glenn's counsel then asked the VE to consider a second hypothetical, one which included the same physical limitations but the following mental limitations: limited to simple directions provided one at a time and would need instructions to refer back to frequently; would need longer time to complete tasks than peers; and would struggle to maintain productivity when exposed to basic stresses and pressures in the

workplace.  Tr. 50.  The VE indicated that those limitations would be full-time work preclusive.
Tr. 50.

Glenn's counsel next asked the VE to return to the first hypothetical but to add to it that
the individual, because of pain, medication side effects, or mental issues, would be off task
approximately 20% of the workday or would miss work frequently.  Tr. 51.  With the additional
off task limitation, the VE indicated that the individual would not be able to perform the jobs
identified in response to the first hypothetical.  Tr. 51.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the
existence of a disability.  "Disability" is defined as the "inability to engage in any substantial
gainful activity by reason of any medically determinable physical or mental impairment which
can be expected to result in death or which has lasted or can be expected to last for a continuous
period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in the
> national economy[6] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to
follow a five-step sequential analysis set out in agency regulations.  The five steps can be
summarized as follows:

1.    If claimant is doing substantial gainful activity, he is not disabled.

---

[6] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the
region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[7] claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[8] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her July 5, 2018, decision, the ALJ made the following findings:[9]

1.      Glenn meets the insured status requirements of the Social Security Act through December 31, 2015.  Tr. 14.

---

[7] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[8] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[9] The ALJ's findings are summarized.

2.      Glenn has not engaged in substantial gainful activity since July 27, 2010, the alleged onset date.  Tr. 14.

3.      Glenn has the following severe impairments: degenerative disc disease, obesity, migraines, affective disorder, and anxiety disorder.  Tr. 14. Glenn's asthma is a non-severe impairment.  Tr. 14.

4.      Glenn does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Tr. 15-16.

5.      Glenn has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) except she can occasionally climb ramps or stairs, never climb ladders, ropes, or scaffolds, frequently balance, and occasionally stoop, kneel, crouch, or crawl; she has the ability to use the bilateral upper extremities frequently for handling and fingering, and must avoid all exposure to hazards such as industrial machinery, unprotected heights, or commercial driving; she has the ability to understand and remember short and multi-step instructions, to perform simple, routine tasks, to perform short and occasional multi-step tasks in a setting without fast pace or strict production requirements, and the ability to adapt to infrequent changes in routine.  Tr. 16-19.

6.      Glenn is unable to perform any past relevant work.  Tr. 19.

7.      Glenn was born in 1983 and was 27 years old, which his defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 19.

8.      Glenn has at least a high school education and is able to communicate in English.  Tr. 19.

9.      Transferability of job skills is not material to the determination of disability.  Tr. 19.

10.     Considering Glenn's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Glenn can perform, including marker, office helper, and counter clerk.  Tr. 19-20.

Based on the foregoing, the ALJ determined Glenn had not been under a disability, as defined in the Social Security Act, from July 27, 2010, through the date of the decision.  Tr. 20.

### V. Plaintiff's Arguments

Glenn argues that the ALJ erred at Step Three by concluding that her impairment did not meet or equal Listing 1.04 (Disorders of the Spine).  Doc. 12, pp. 7-9.  Glenn also argues that the ALJ erred in weighing the medical opinion evidence and by not including in the RFC restrictions that were contained in the opinion rendered by the consultative examiner.  Doc. 12, pp. 10-11.

### VI. Law & Analysis

**A.     Standard of review**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the

case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.      The ALJ did not err at Step Three**

Glenn argues that the ALJ erred at Step Three by concluding that her impairment did not meet or equal Listing 1.04 (Disorders of the Spine).  Doc. 12, pp. 7-9.  Initially in her Brief, Glenn cites to both Listing 1.04(A) and Listing 1.04(B).  Doc. 12, pp. 1-2.  However, her argument with respect to Listing 1.04 is premised on her claim that her impairment equals Listing 1.04(A).  Doc. 12, pp. 7-9; *see also* Tr. 52-53 (Hearing Transcript – counsel arguing that Glenn could be found to meet Listing 1.04(A)).  Accordingly, the Court's focus is on the ALJ's consideration of Glenn's impairments under Listing 1.04(A).

At Step Three of the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii).  The claimant bears the burden of establishing that his condition meets or equals a Listing.  *Thacker v. SSA*, 93 Fed. Appx. 725, 727-728 (6th Cir. 2004) (citing *Buress v. Sec'y of Health and Human Serv's.*, 835 F.2d 139, 140 (6th Cir. 1987)).  Thus, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker* 93 Fed. Appx. at 728 (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)).  "Each listing specifies 'the objective medical and other findings needed to satisfy the criteria of that listing.'" *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414 (6th Cir. 2011).  "A claimant must satisfy all the criteria to 'meet' the listing." *Id.*  "[A]claimant is also disabled if her impairment is the *medical equivalent* of a listing[.]" *Id.*  (emphasis in original).  In assessing equivalency, an ALJ "looks to the opinions of

the state agency medical advisors and/or the opinion of a testifying medical expert for guidance on the issue of whether the medical findings are at least equal in severity and duration of the listing findings." *Johnson v. Colvin*, 2014 WL 1418142, *3 (W.D. Ky. Apr. 14, 2014) (citing 20 C.F.R. § 404.1526).

> Listing 1.04 provides:
>
> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) . . .

20 C.F.R. § Pt. 404, Subpt. P, App. 1.

At Step Three, the ALJ analyzed Glenn's impairments under various listings, including 1.04, and concluded that Glenn did not have an impairment or combination of impairments that met or equaled the criteria for any listed impairment.  Tr. 15-16.  With respect to Glenn's physical impairments, at Step Three the ALJ stated:

> The severity of the claimant's physical impairments, considered singly or in combination, does not meet or medically equal the criteria of any impairment listed in listing 1.04, with consideration given to SSR 02-1p.  The claimant's back impairment does not result in motor loss accompanie[d] by sensory or reflex loss, nor has positive straight-leg raising testing been indicated (Ex. 14F/3).

Tr. 15.

Glenn contends that the ALJ's Step Three finding is in error.  She points to various portions of the record in an attempt to demonstrate that each of the requirements of Listing 1.04(A) are met.  Doc. 12, pp. 7-8.  She contends that, contrary to the ALJ's finding, there is evidence of motor loss with sensory or reflex loss and evidence of positive straight leg testing.

Doc. 12, pp. 7-8.  In support of this claim, Glenn points to records located at Tr. 803, 766, 657, 664, and 661.  A review of those record citations, however, does not support her claim that the ALJ erred at Step Three.

For example, one of the records cited by Glenn to support her claim, i.e., Tr. 803, reflects that, in September 2017, Glenn exhibited no motor weakness.  Glenn relies on January 6, 2012, BWC records to support her claim of significant weakness and motor loss.  Doc. 12, p. 8, n. 37 (citing Tr. 657).  That record indicates that Glenn complained of weakness and, on physical examination, Glenn exhibited limited lumbar range of motion.  Tr. 657, 658.  However, it also reflects physical examination findings of a normal narrow-based gait; grade 5 motor strength throughout the lower extremities; no muscular atrophy; sensory examination intact to light touch and pinwheel; deep tendon reflexes were 1-2/4 equal and symmetric; and straight leg raising negative. Tr. 658.

Glenn relies on an October 3, 2011, BWC record to satisfy the straight leg raise testing requirement of Listing 1.04(A).  Doc. 12, p. 8, n. 40 (citing Tr. 664).  Physical examination findings from that evaluation reflect a positive Lasegues Test aka straight leg raise test.[10]  Tr. 661.  However, there is no indication that the straight leg test was positive both sitting and supine as required by the listing.[11]  Also, the physical examination findings from that same evaluation reflect that Glenn's reflexes were graded at 2/4 for patella and 2/4 for Achilles and were symmetrical and sensory evaluation was within normal limits.  Tr. 661.

Glenn contends that a February 7, 2018, treatment note, which states "[s]eeing some equilibration of her reflexes which is exciting and stable enough but no sig improvement

---

[10] *See* FN 3 above.

[11] Similarly, during an October 14, 2015, office visit prior to Glenn's second surgery, there was a positive straight leg test but there is no indication whether it was both sitting and supine.  *See* Tr. 415.

anymore and suspect neurologically at plateau[,]" evidences sensory or reflex loss (Tr. 766). Doc. 12, p. 8, n. 3 (citing Tr. 766).   This treatment note does not clearly evidence sensory or reflex loss.  And, even if it could be interpreted as such, Glenn has not demonstrated that the ALJ erred in concluding that Listing 1.04(A) is not met because there must also be motor loss.  To demonstrate motor loss, Glenn relies on her subjective complaint of weakness noted in a January 6, 2012, BWC record.  Doc. 12, p. 8, n. 37 (citing Tr. 657).  Yet, other records reflect no motor weakness and/or no atrophy.  *See e.g.,* Tr. 658, 803, 807, 813, 819.

Based on the foregoing, the Court finds that the ALJ did not miss an entire step of the necessary disability analysis.  As reflected above, the ALJ discussed Listing 1.04 and specifically referred to criteria in Listing 1.04(A) that the ALJ found were not supported by the evidence.  In addition to explaining her Step Three findings, in her decision, the ALJ discussed in detail Glenn's treatment history.  Also, the ALJ considered and weighed the medical opinion evidence, including the opinions of the state agency reviewing physicians, who reviewed the record and found no listing level impairment.

As explained above, the records that Glenn cites in support of her assertion that her impairment meets Listing 1.04(A) do not support her position.  Furthermore, Glenn has not shown that the ALJ's Step Three Listing 1.04(A) finding is not supported by substantial evidence.  It is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.  Here, the ALJ considered the entirety of the record and, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.

Considering the foregoing, the Court finds that the ALJ properly considered Glenn's impairments at Step Three.  Further, the Court finds that Glenn has not demonstrated that the ALJ's Step Three finding is unsupported by substantial evidence nor has she demonstrated that the ALJ's Step Three finding is not sufficiently explained to allow for meaningful review by the Court.

**C.      The ALJ did not err in weighing the medical opinion evidence**

Glenn argues that the ALJ erred in weighing the medical opinions of Drs. Kravitz and Hoyle, the state agency reviewing psychologists, and Dr. Janco-Gidley, the consultative examining psychologist, and by failing to include in the RFC restrictions contained in Dr. Janco-Gidley's opinion.  Doc. 12, pp. 10-11.

The Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all the relevant evidence" of record.  20 C.F.R. §§ 404.1545(a)(3), 404.1546(c).   Here, there is no question that the ALJ considered all the relevant evidence in the record.

Furthermore, the ALJ, not a physician, is responsible for assessing a claimant's RFC.  *See* 20 C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009). When assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding . . . [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.*  And, "[e]ven where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale."  *Reeves v. Comm'r of Soc. Sec.*, 618 Fed. Appx. 267, 275

(6th Cir. 2015) (unpublished); *see also Moore v. Comm'r of Soc. Sec.*, 2013 WL 6283681, * 7-8 (N.D. Ohio Dec. 4, 2013) (even though the ALJ did not incorporate into the RFC all limitations from a consultative examiner's opinion that the ALJ assigned great weight to, the ALJ's decision was not procedurally inadequate nor unsupported by substantial evidence).  Furthermore, an ALJ is not obligated to explain each and every limitation or restriction adopted or not adopted from a non-examining physician's opinion.  *See Smith v. Comm'r of Soc. Sec.*, 2013 WL 1150133, * 11 (N.D. Ohio Mar. 19, 2013) *affirmed*, 6th Cir. 13-3578 (Jan. 30, 2014).

Glenn takes issue with the ALJ's weighing of non-treating source opinions and takes aim at the ALJ's failure to include in the RFC all the limitations contained in Dr. Janco-Gidley's opinion.  The ALJ did not ignore the non-treating source opinions.  Rather, the ALJ discussed and weighed the opinion evidence.  Tr. 18-19 (assigning partial weight to the state agency reviewing psychologists' opinions and giving greater weight to Dr. Janco-Gidley's opinion than assigned by the state agency reviewers).[12]  Furthermore, the ALJ did not ignore or fail to account of limitations resulting from Glenn's mental impairments.  The ALJ's mental RFC included the following limitations:

> She has the ability to understand and remember short and multi-step instructions, to perform simple, routine tasks, to perform short and occasional multi-step tasks in a setting without fast pace or strict production requirements, and the ability to adapt to infrequent changes in routine.

Tr. 16.

Glenn takes issue with the RFC because it provides for the ability to perform short and multi-step instructions and the ability to perform multi-step tasks but Dr. Janco-Gidley opined that Glenn would *likely* struggle with more complex or multistep instructions and the ALJ did not include RFC limitations to account for Dr. Janco-Gidley's opinions that Glenn would *likely*

---

[12] The state agency reviewers assigned little weight to Dr. Janco-Gidley's opinion.  *See* Tr. 82, 101.

benefit from written instructions she could refer back to and that she *may* take longer than her peers to complete tasks.  Doc. 12, pp. 10-11 (emphasis supplied).

The ALJ's finding that Glenn had the ability to understand and remember short and multi-step instructions is supported by the state agency reviewing psychologists' opinions.  Tr. 85, 122 (finding that claimant is able to understand and remember short and multi-step tasks). Further, as discussed above, notwithstanding the amount of weight assigned to Dr. Janco-Gidley's opinion, the ALJ was not required to adopt her opinion verbatim.  Thus, the ALJ's decision not to include a requirement for written instructions or the need for additional time to complete tasks is not a basis upon which to reverse the ALJ's decision.

Additionally, Dr. Janco-Gidley indicated that Glenn would *likely* struggle with more complex or multistep instructions.  Tr. 484.  Dr. Janco-Gidley did not opine that Glenn had no ability to handle short and multi-step instructions.  And the ALJ limited Glenn with respect to her ability to perform multi-step tasks, i.e., she limited Glenn to performance of *occasional* multi-step tasks in a setting without fast pace or strict production requirements.  Tr. 16.  Glenn has not shown that this limitation does not sufficiently account for her understanding and memory limitations or her limitations in maintaining sustained concentration, persistence or pace.  Furthermore, the RFC limitation is supported by the state agency reviewing psychologists' opinion.  Tr. 86, 122 (finding that Glenn's symptoms of anxiety and depression would cause impairment but finding that Glenn had the ability to perform short and occasional multi-step tasks in a setting with flexible pace and productions requirements).

In sum, Glenn has not shown that the ALJ failed to consider the medical opinion evidence; she has not shown that the ALJ erred by not adopting the medical opinions verbatim; she has not shown that mental impairment limitations greater than those included in the RFC

were necessary to account for her mental impairments; and she has not shown that the RFC is unsupported by substantial evidence.  Thus, the Court finds that reversal and remand is not warranted.

### VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.


Dated: April 16, 2020                              */s/ Kathleen B. Burke*
                                                   Kathleen B. Burke
                                                   United States Magistrate Judge